1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  St. Paul Fire & Marine Ins. Co. et al.,        )        No. CV-11-1954-PHX-SMM

10                      Plaintiffs,        )

11  v.        )        **MEMORANDUM OF DECISION AND**
                                                  **ORDER**
12  Ohio Cas. Ins. Co. et al.,        )

13                      Defendants.        )

14  _____        )

15  Transportation Ins. Co. et al.,        )

16                      Counter/cross-claimants,        )

17  v.        )

18  St. Paul Fire & Marine Ins. Co. et al.,        )

19                      Counter/cross-defendants.        )

20  _____        )

21  Zurich Am. Ins. Co.,        )

22                      Counter/cross-claimant,        )

23  v.        )

24  St. Paul Fire & Marine Ins. Co. et al.,        )

25                      Counter/cross-defendants.        )

26  _____        )

27  Am. Home Assurance Co. et al.,        )

28                      Counter/cross-claimants,        )

v.                                        )
                                          )
St. Paul Fire & Marine Ins. Co. et al.,   )
                                          )
        Counter/cross-defendants.         )
                                          )
_____ )
                                          )
Lexington Ins. Co.,                       )
                                          )
        Counter/cross-claimant,           )
                                          )
v.                                        )
                                          )
St. Paul Fire & Marine Ins. Co. et al.,   )
                                          )
        Counter/cross-defendants.         )
                                          )
_____ )

Before the Court are two motions for summary judgment. First is American Home Assurance Company's ("AHAC") and Commerce and Industry Insurance Company's ("CIIC") Motion for Partial Summary Judgment Against Liberty Mutual Fire Insurance Company ("LMFIC") (Doc. 264), to which LMFIC responded (Doc. 292), but AHAC and CIIC did not reply. Second is LMFIC's Motion for Summary Judgment Against Plaintiffs' and Cross-claimants' Claims (Doc. 267), to which both Plaintiffs and AHAC/CIIC responded (Docs. 288; 291), and LMFIC replied (Docs. 296; 297).[1] For the reasons that follow, AHAC/CIIC's motion is granted, and LMFIC's motion is denied.[2]

/ / /

/ / /

/ / /

_____

[1] LMFIC moved for summary judgment against "all claims made against it by Plaintiffs and Cross-claimants." (Doc. 267 at 2.) Although each Cross-claimant brought cross-claims against LMFIC (Docs. 120; 132; 153; 154; 155), AHAC/CIIC were the only Cross-claimants to respond to LMFIC.

[2] The parties' request for oral argument is denied. There was an adequate opportunity to present written argument, and oral argument will not aid the Court's decision. LRCiv. 7.2(f); Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

1

**BACKGROUND**[3]

2       This declaratory judgment action is rooted in a Sun City Grand residential housing

3   development (the "Development") constructed in Surprise, Arizona between 1996 and 2005.

4   The general contractor was Del Webb Home Construction, Inc., ("DWHC") a wholly-owned

5   subsidiary of Del Webb Communities, Inc., ("DWCI"), which is itself a wholly owned

6   subsidiary of Del Webb Corporation ("DWC"). (Doc. 229-2 ¶¶ 2-3.) DWHC entered into

7   various subcontracts (the "Subcontracts") with ANSE, Inc., doing business as Arizona State

8   Plastering ("ANSE"), in which ANSE was to provide "all labor, material, equipment and

9   supervision to perform all operations in connection with the installation of all thin-wall

10  stucco system work." (Doc. 265-3 at 25, 42, 105, 109, 124, 145, 164.)

11      The Subcontracts also required ANSE to maintain commercial general liability

12  ("CGL") insurance and to endorse the policies to include as additional insureds DWC,

13  DWCI, and DWHC (collectively "Del Webb"). (Id. at 17-18, 72-73, 99-100.) AHAC and

14  CIIC insured ANSE from October 1, 2001, to January 1, 2006. (Doc. 265 ¶¶ 24, 25.) LMFIC

15  issued two policies (the "Policies") insuring ANSE from February 1, 2007, until February

16  1, 2009 (Docs. 265-1 at 5; 265-2 at 4), during which time 99% of ANSE's work involved

17  application of "traditional" or "natural" stucco (Doc. 288-1 at 67). The premiums charged

18  for the Policies were initially estimated based on the type of business ANSE was involved

19  in: "masonry" and "plastering and stucco work" according to LMFIC's underwriting file. (Id.

20  at 43-45.) LMFIC performed a premium audit in which the auditor described ANSE's

21  operations as the "application of exterior stucco." (Id. at 34.) After the audit, LMFIC charged

22  ANSE an adjusted premium of more than $230,000.00 for the two years. (Id. at 24, 39.)

23      On January 25, 2008, hundreds of Development homeowners served DWCI, the entity

24  that sold the homes, with notice of construction defects pursuant to Arizona's Purchaser

25  Dwelling Act, Ariz. Rev. Stat. ("A.R.S.") § 12-1361 et seq., (the "Zelkind Notice") that

26  _____

27      [3] The Court exercises its discretion to consider materials in the record other than those
    cited to by the parties. Fed. R. Civ. P. 56(c)(3); Payne v. Peninsula School Dist., 653 F.3d

28  863, 895 n.11 (9th Cir. 2011) (en banc) (Callahan, J., concurring).

1    alleged <u>inter alia</u> stucco defects and collateral property damage resulting therefrom. (Docs.

2    229-2 ¶ 5; 265 ¶ 8.) On the same day, hundreds of other Development homeowners served

3    DWCI with a Demand for Arbitration that also alleged stucco defects and resultant collateral

4    property damage (the "Roberts Arbitration"). (Docs. 229-2 ¶ 6; 265 ¶¶ 9-10.)

5           After receiving the Zelkind Notice and the Roberts Arbitration Demand, Del Webb

6    tendered its defense and indemnity as provided for in the Subcontracts. (Doc. 265 ¶ 18.)

7    Upon Del Webb's tender, AHAC and CIIC acknowledged their duty to defend and have

8    paid—and continue to pay—defense costs. (Doc. 265 ¶¶ 25, 26.) LMFIC, however, denied

9    any duty to defend because the Policies "exclude[] damages associated with exterior

10   insulation and finishing systems," or "EIFS." (<u>Id.</u> ¶ 19.) The Zelkind Notice eventually

11   matured into a civil action in which over 500 homeowners sued Del Webb for construction

12   defects; the case, <u>Glen Zelkind et al. v. Del Webb Communities</u>, Maricopa Superior Court

13   Case No. CV2008-3089 (the "Zelkind Action"), is ongoing and has gone to trial. (Docs. 265

14   ¶¶ 11-16; 332.) As of January 3, 2014, more than $13 million had been spent defending Del

15   Webb in the Zelkind Action alone. (Doc. 332.) Similarly, the Roberts Arbitration, American

16   Arbitration Association case number 76 110 Y 00073 08, grew to include over 500

17   homeowners and resulted in a total award against Del Webb in excess of $13.5 million,

18   which Del Webb is appealing. (Docs. 226-4 at 56; 265 ¶ 17.) The defense of Del Webb in

19   the Zelkind Action and the Roberts Arbitration (collectively the "Underlying Actions") thus

20   exceeds $26 million, and continues to climb.

21          The brunt of the costs of defense has been borne by St. Paul Fire and Marine

22   Insurance Company, Charter Oak Fire Insurance Company, and Travelers Indemnity

23   Company of America (collectively "Plaintiffs").[4] On October 6, 2011, Plaintiffs filed this

24   action against insurers that had a duty to contribute to Del Webb's defense but either refused

25   to contribute, or did not contribute enough. (Doc. 197.) Plaintiffs and Counter/Cross-

26

27

28       [4] The Counter/Cross-claimants have contributed to the costs of defense. (Docs. 120; 153; 154; 155; 214.)

claimants seek a declaration of the parties' duties to defend and entitlement to reimbursement. (Docs. 120; 153; 154; 155; 197; 214). On April 16, 2012, the Court held a Rule 16 Scheduling Conference at which the Court and all the parties agreed the best way to proceed was by bifurcating the proceedings so that questions of coverage were resolved before reaching issues of policy exhaustion and apportionment of defense costs. (Docs. 97; 98; see Doc. 319.)

LMFIC moved for summary judgment against Plaintiffs and Cross-claimants positing that they had no duty to defend because ANSE's stucco work at the Development falls within the EIFS exclusion.[5] Plaintiffs and AHAC/CIIC responded that EIFS is an industry term for a synthetic water-proof alternative to traditional stucco and thus does not apply to the traditional stucco work performed by ANSE. Plaintiffs also argue that even if stucco does fall within the exclusion, enforcing it as such would contravene ANSE's reasonable expectation of coverage. LMFIC replied that the reasonable-expectations doctrine does not apply, that traditional stucco is within the EIFS exclusion, and that Plaintiffs' and

---

[5] The exclusions purport to exclude from coverage " 'property damage' . . . arising out of, caused by, or attributable to, whether whole or in part, . . . installation [or] application . . . of any 'exterior insulation and finishing system' or any part thereof, or any substantially similar system or any part thereof." (Docs. 265-1 at 63; 265-2 at 63.) EIFS is defined as:

> [A] non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:
> 1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;
> 2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;
> 3. A reinforced or unreinforced base coat;
> 4. A finish coat providing surface texture to which color may be added; and
> 5. Any flashing, caulking or sealant used with the system for any purpose.

(Docs. 265-1 at 63; 265-2 at 63.) The exclusion in the Policies is a standard form. See Insurance Service Office, Commercial General Liability Coverage Form (2004) CG 21 86 12 04, reprinted in 2 International Risk Management Institute, Commercial Liability Insurance at VI.I.87 (Supp. 2013).

1  AHAC/CIIC's evidence to the contrary is inadmissible. AHAC/CIIC's summary judgment
2  motion encompasses the same issues, plus an additional issue of whether LMFIC owed Del
3  Webb a defense from the date of tender. (Doc. 264 at 19.) LMFIC argues the Court should
4  not consider any argument outside the narrow scope of argument agreed upon between
5  AHAC/CIIC and LMFIC: the applicability of the EIFS exclusion.

6                                    **LEGAL STANDARDS**

7         "The court shall grant summary judgment if the movant shows that there is no genuine
8  dispute as to any material fact and the movant is entitled to judgment as a matter of law."
9  Fed. R. Civ. P. 56(a). "The substantive law determines which facts are material; only disputes
10  over facts that might affect the outcome of the suit under the governing law properly preclude
11  the entry of summary judgment." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682
12  F.3d 1144, 1147 (9th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
13  (1986)). To prove the absence of a genuine dispute, the moving party must demonstrate that
14  "the evidence is such that [no] reasonable jury could return a verdict for the nonmoving
15  party." Liberty Lobby, 477 U.S. at 248. In determining whether a party has met its burden,
16  a court views the evidence in the light most favorable to the non-moving party and draws all
17  reasonable inferences in the non-moving party's favor. Liberty Lobby, 477 U.S. at 255.
18  While a court may consider only admissible evidence in ruling on a motion for summary
19  judgment, the focus is not "on the admissibility of the evidence's form," but "on the
20  admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

21         Federal courts sitting in diversity apply the forum state's choice of law rules to
22  determine controlling substantive law. Klaxon Co. v. Stentor Elec. Mfg. Co. Inc., 313 U.S.
23  487, 496 (1941). Arizona adheres to Restatement (Second) of Conflict of Laws § 193 (1971),
24  which states that insurance contracts are generally governed "by the local law of the state
25  which the parties understood was to be the principal location of the insured risk during the
26  term of the policy." Beckler v. State Farm Mut. Auto. Ins. Co., 195 Ariz. 282, 286, 987 P.2d
27  768, 772 (App. 1999). Since the principal location of the insured risk was in Arizona,
28  Arizona law governs the Policies.

1    "The traditional view of the law of contracts is that a written agreement adopted by

2    the parties will be viewed as an integrated contract which binds those parties to the terms

3    expressed within the four corners of the agreement." Darner Motor Sales, Inc. v. Universal

4    Underwriters Ins. Co., 140 Ariz. 383, 390, 682 P.2d 388, 395 (1984). However, "the usual

5    insurance policy is a special kind of contract," id., in part because it is not "arrived at by

6    negotiation between the parties," Zuckerman v. Transamerica Ins. Co., 133 Ariz. 139, 144,

7    650 P.2d 441, 446 (1982). Instead, "[i]t is largely adhesive; some terms are bargained for,

8    but most terms consist of boilerplate, not bargained for, neither read nor understood by the

9    buyer, and often not even fully understood by the selling agent." Darner, 140 Ariz. at 391,

10   682 P.2d at 396. Moreover, "[t]he adhesive terms generally are self-protective; their major

11   purpose and effect often is to ensure that the drafting party will prevail if a dispute goes to

12   court." Gordinier v. Aetna Cas. & Sur. Co., 154 Ariz. 266, 271, 742 P.2d 277, 282 (1987).

13   Accordingly, "special contract rules should apply." Id.

14   Interpretation of insurance policies is a question of law. Sparks v. Republic Nat. Life

15   Ins. Co., 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). "Provisions of insurance policies

16   are to be construed in a manner according to their plain and ordinary meaning," id., but if a

17   clause is reasonably susceptible to different interpretations given the facts of the case, the

18   clause is to be construed "by examining the language of the clause, public policy

19   considerations, and the purpose of the transaction as a whole," State Farm Mut. Auto. Ins.

20   Co. v. Wilson, 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989). While ambiguities are

21   generally construed against the insurer, courts are "not compelled in every case of apparent

22   ambiguity to blindly follow the interpretation least favorable to the insurer." Emp'rs Mut.

23   Cas. Co. v. DGG & CAR, Inc., 218 Ariz. 262, 264, 183 P.3d 513, 515 (2008) (quoting

24   Wilson, 162 Ariz. at 257, 782 P.2d at 733). Instead, the question is "how the language of the

25   policy applies to the specific facts of the case." Id. (quoting Preferred Risk Mut. Ins. Co. v.

26   Lewallen, 146 Ariz. 83, 85, 703 P.2d 1232, 1234 (App. 1985)).

27   "In determining whether there is an ambiguity that should be construed against the

28   insurer, the language should be examined from the viewpoint of one not trained in law or the

insurance business," <u>Samsel v. Allstate Ins. Co.</u>, 204 Ariz. 1, 4, 59 P.3d 281, 284 (2002), and in the light of parol evidence, <u>Taylor v. State Farm Mut. Auto. Ins. Co.</u>, 175 Ariz. 148, 154-55 & n.2, 854 P.2d 1134, 1140-41 & n.2 (1993). In making this determination, a court's interpretive analysis is "not limited to considering only the text of the agreement,"<u>Burkons v. Ticor Title Ins. Co. of Cal.</u>, 168 Ariz. 345, 350, 813 P.2d 710, 715 (1991), and "may always consider the surrounding circumstances," <u>Smith v. Melson, Inc.</u>, 135 Ariz. 119, 122, 659 P.2d 1264, 1267 (1983). "If, for example, parties use language that is mutually intended to have a special meaning, and that meaning is proved by credible evidence, a court is obligated to enforce the agreement according to the parties' intent, even if the language ordinarily might mean something different." <u>Taylor</u>, 175 Ariz. at 153, 854 P.2d at 1139 (citing <u>Restatement (Second) Contracts</u> § 212 cmt. b, illus. 3 & 4 (1981)).

Furthermore, "the policy may not be interpreted so as to defeat the reasonable expectations of the insured." <u>Samsel</u>, 204 Ariz. at 4, 59 P.3d at 284. "Under this doctrine, a contract term is not enforced if one party has reason to believe that the other would not have assented to the contract if it had known of that term." <u>First Am. Title Ins. Co. v. Action Acquisitions, LLC</u>, 218 Ariz. 394, 400, 187 P.3d 1107, 1113 (2008); <u>accord</u> <u>Averett v. Farmers Ins. Co.</u>, 177 Ariz. 531, 533, 869 P.2d 505, 507 (1994) (quoting <u>Gordinier</u>, 154 Ariz. at 272, 742 P.2d at 283); <u>Darner</u>, 140 Ariz. at 392, 682 P.2d at 397. "One of the basic principles which underlies [the doctrine] is simply that the language in the portion of the instrument that the customer is not ordinarily expected to read or understand ought not to be allowed to contradict the bargain made by the parties." <u>Averett</u>, 177 Ariz. at 533, 869 P.2d at 507 (quoting <u>State Farm Mut. Auto. Ins. Co. v. Bogart</u>, 149 Ariz. 145, 151, 717 P.2d 449, 455 (1986), <u>superseded by statute on other grounds as recognized in</u> <u>Consolidated Enters., Inc. v. Schwindt</u>, 172 Ariz. 35, 38, 833 P.2d 706, 709 (1992)).

The insured bears the burden of proving the applicability of the reasonable expectations doctrine at trial. <u>State Farm Fire & Cas. In. Co. v. Grabowski</u>, 214 Ariz. 188, 190, 150 P.3d 275, 277 (App. 2007). The doctrine applies only if two predicate conditions are present. First, the insured's "expectation of coverage must be objectively reasonable."

1   Millar v. State Farm Fire and Cas. Co., 167 Ariz. 93, 97, 804 P.2d 822, 826 (App. 1990).

2   Second, the insurer "must have had a reason to believe that the [insured] would not have

3   purchased the . . . policy if they had known that it included" the complained of exclusion.

4   State Farm Fire & Cas. In. Co. v. Grabowski, 214 Ariz. 188, 193-94, 150 P.3d 275, 280-81

5   (App. 2007). Provided both of these conditions are satisfied, "Arizona courts will not enforce

6   even unambiguous boilerplate terms in standardized insurance contracts in a limited variety

7   of situations." Gordinier, 154 Ariz. at 272, 742 P.2d at 283.

8          Finally, insurers expressly obligate themselves to defend their insureds against any

9   claim of liability potentially covered by the policy. Ariz. Prop. & Cas. Ins. Guar. Fund v.

10  Helme, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987); United Servs. Auto. Ass'n v. Morris,

11  154 Ariz. 113, 118, 741 P.2d 246, 250 (1987). The duty to defend is triggered if the

12  complaint facially "alleges facts which come within the coverage of the liability policy . . . ,

13  but if the alleged facts fail to bring the case within the policy coverage, the insurer is free of

14  such obligation." Kepner v. Western Fire Ins. Co., 109 Ariz. 329, 331, 509 P.2d 222, 224

15  (1973) (quoting C. T. Drechsler, Annotation, Allegations in Third Person's Action Against

16  Insured as Determining Liability Insurer's Duty to Defend, 50 A.L.R. 2d 458 §3, at 464

17  (1956)). "If the insurer refuses to defend and awaits the determination of its obligation in a

18  subsequent proceeding, it acts at its peril, and if it guesses wrong it must bear the

19  consequences of its breach of contract." Id. at 332, 509 P.2d at 225.

20                                **DISCUSSION**

21         At this stage of the proceedings, the ultimate issue for the instant motions is whether

22  or not LMFIC had a duty to defend. (Doc. 319 at 2.) LMFIC seeks to preserve other policy

23  defenses and argues that the sole issue is the applicability of the EIFS exclusion. (Doc. 267

24  at 7-8.) If LMFIC wanted to raise other defenses to coverage under a different briefing

25  schedule, it should have sought modification of the scheduling order. See Fed. R. Civ. P.

26  16(b)(4). Since a stipulation between the parties does not constitute good cause, see id., the

27  Court will reach all issues relating to the question of coverage. The existence vel non of

28  LMFIC's duty to defend is a matter of contract interpretation.

1    **I.      The EIFS Exclusion is Ambiguous and Should be Construed Against LMFIC**

2           As a preliminary matter, LMFIC contends that the Court cannot consider parol

3    evidence because the exclusionary language is unambiguous. The rule in Arizona for over

4    thirty years has been that "the purpose of an agreement is to be divined from the entire

5    instrument and the surrounding circumstances." <u>Smith</u>, 135 Ariz. at 122, 659 P.2d at 1267.

6    "In Arizona, therefore, the interpretation of a negotiated agreement is not limited to the

7    words set forth in the document." <u>Darner</u>, 140 Ariz. at 393, 682 P.2d at 398. Moreover, the

8    Arizona Supreme Court flatly rejected "the often repeated and usually over-simplified

9    construct that ambiguity must exist before parol evidence is admissible." <u>Tayor</u>, 175 Ariz.

10   at 154, 854 P.2d at 1140. Instead, "the judge first considers the offered evidence and, if he

11   or she finds that the contract language is 'reasonably susceptible' to the interpretation

12   asserted by its proponent, the evidence is admissible to determine the meaning intended by

13   the parties." <u>Id.</u> "Consequently, although relevant, contract ambiguity is not the only linchpin

14   of a court's decision to admit parol evidence." <u>Id.</u> LMFIC's contention is misplaced.

15          While Plaintiffs and AHAC/CIIC do not dispute the exclusions are facially

16   unambiguous, they propose that ANSE and LMFIC did not intend for the phrase "exterior

17   insulation and finishing system" to have its plain and ordinary meaning, but intended the

18   phrase to carry a special meaning it has in the construction industry. Specifically, LMFIC and

19   ANSE intended the phrase to refer to a synthetic waterproof alternative to traditional stucco.

20   As evidence that the special meaning was intended, Plaintiffs and AHAC/CIIC cite the

21   declaration and deposition of ANSE's vice-president during the time in question, Charles

22   Nibley. Mr. Nibley stated he did not understand EIFS and traditional stucco to be

23   substantially similar and that he was not aware of anyone in the industry treating EIFS and

24   traditional stucco as interchangeable. (Docs. 266 ¶¶ 10, 11; 288-1 at 62; 297-1 at 4.)

25          To bolster the position that EIFS carries special meaning in the construction industry,

26   Plaintiffs and AHAC/CIIC cite several cases where courts in different jurisdictions have

27   grappled with EIFS. A recent decision from the Supreme Court of Texas is helpful:

28   / / /

> Long used in commercial construction, EIFS was marketed in the early 1990s as an attractive alternative to conventional stucco in home construction. But installed on wood-frame walls typical of single-family homes, EIFS traps water inside, causing rot and structural damage, mildew and mold, and termite infestations. . . . Lennar Corporation and another homebuilder it bought built some 800 homes using EIFS, but stopped using it in 1998. After the problems with EIFS were exposed on the NBC television show Dateline in 1999, homeowner complaints poured in. Lennar investigated and learned that the problems associated with EIFS were frequent and substantial. . . . Lennar decided . . . to contact all its homeowners and offer to remove the EIFS and replace it with conventional stucco.

Lennar Corp. v. Markel Am. Ins. Co., 413 S.W.3d 750 (Tex. 2013). The overwhelming weight of authority is consistent with Lennar's thumbnail sketch. E.g., French v. Assurance Co. of Am., 448 F.3d 693, 696 (4th Cir. 2006) ("synthetic stucco system known as . . . []EIFS[]"); Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co., 586 F.Supp.2d 718, 721 (S.D. Tex. 2008) (" 'EIFS' is short for 'exterior insulation and finish system,' a multi-layered synthetic exterior cladding that possesses insulating properties and serves as an inexpensive alternative to traditional, natural stucco finishes."), rev'd in part on other grounds, 592 F.3d 687 (5th Cir. 2010); Kincaid v. Dess, 298 P.3d 358, 363 (Kan. Ct. App. 2013) ("[]EIFS[], also known as synthetic stucco[,] . . . is a multi-layered exterior finish system that looks similar to traditional stucco but is soft and sounds hallow when tapped. The problem with EIFS is when moisture is present behind the covering it can become trapped behind the layers and can lead to wood rot."); 2 Philip L. Bruner & Patrick J. O'Connor, Bruner and O'Connor on Construction Law § 7:124.50 (2007) ("In contrast to traditional stucco, which is a 'natural' product composed of sand, portland cement, and other materials, EIFS is a synthetic product which has an insulating capability."). United States District Courts in the Southern and Western Districts of Texas have distinguished EIFS from traditional stucco in applying EIFS exclusions different from the exclusion in the instant Policies. Catlin Specialty Ins. Co. v. Montelongo, Inc., No. 5:12-CV-711-XR, 2013 WL 1702172, at *3 (W.D. Tex. Apr. 18, 2013) (reasoning that damages arising from stucco may fall outside of EIFS exclusion); Ins. Corp. of Hannover v. Skanska USA Bldg., Inc., No. B-05-304, 2008 WL 2704654, at *4 & n.4 (S.D.Tex. July 3, 2008) (same). The Court has not uncovered, nor have the parties cited, any authority concerning the applicability of the EIFS exclusion at issue to natural stucco.

LMFIC does not deny that EIFS carries a special meaning in the construction industry but tries to sidestep the issue arguing that even if traditional stucco does not meet the Policies' enumerated definition of EIFS, traditional stucco is at least substantially similar thereto.[6] As proof, LMFIC points to Mr. Nibley's deposition in which he acknowledges that the exclusion does not expressly define EIFS as using only synthetic resin (Doc. 296-1at 3-4), and admits that, according to LMFIC's interpretation of the Policies, ANSE had no coverage for their work. (Doc. 292-1 at 16-21).

This diversion fails for several reasons, not the least of which is that LMFIC's proof necessarily means that Mr. Nibley—an executive in the siding industry who was responsible for incorporating insurance premiums into estimates of project cost (Doc. 288-1 at 59-65)—only realized the EIFS exclusion applied after a lawyer for LMFIC walked him through the exclusion belaboring how ANSE's stucco work at the development was "similar" to the exclusionary language. (Doc. 292-1 at 16-21). Notably, Mr. Nibley commented that LMFIC's counsel was "trying to make large generalities," and maintained that the "exclusion is similar to, but not an EFIS system." (Id. at 10, 21.)

LMFIC's "substantially similar" argument is overly broad and conflicts with the facts of this case. Webster defines "similar" as "having characteristics in common: very much alike," and "substance" as "a fundamental part, quality, or aspect: essential quality or import: the characteristic or essential part." Webster's Third New International Dictionary 2120, 2279 (2002). Whether two objects share fundamental characteristics so that they are "very much alike," or are "qualitatively common," depends on the objects themselves.

While conceding that there are differences of material composition and physical properties between EIFS and the stucco ANSE applied at the Development, LMFIC declares

---

[6] The Court notes that LMFIC equivocates on whether it is arguing substantial similarity. With respect to AHAC/CIIC, LMFIC claims that it "does not argue that 'stucco is substantially similar to EIFS' " (Doc. 297 at 9:20-21), but with respect to Plaintiffs, LMFIC adopts the contrary position and asserts that natural stucco "is substantially similar to the system defined in LMFIC's policy" (Doc. 296 at 11:3-4).

1  ipse dixit that these differences are "not substantial." (Doc. 296 at 11.) However, whether the

2  differences between stucco and EIFS are substantial depends on what the parties meant by

3  "exterior insulation and finishing system." The mere fact that the term itself is facially

4  unambiguous sheds no light on whether the parties intended the term to have a special

5  meaning. This is the core of Plaintiffs' and AHAC/CIIC's argument: the term was not

6  intended to broadly refer to all exterior insulation and finish systems, but was mutually

7  understood to have a specific meaning consistent with its use in the construction trade: that

8  is, traditional stucco is not synonymous with synthetic resin based finish systems. The

9  conspicuous absence of any evidence that EIFS and stucco are interchangeable supports this

10  distinction.

11       "[T]rade usage can be used to determine whether a contract is ambiguous." <u>L.K.</u>

12  <u>Comstock & Co. v. United Eng'rs & Constructors Inc.</u>, 880 F.2d 219, 223 (9th Cir. 1989)

13  (citing cases and concluding "Arizona law supports the district court's reliance on custom

14  and usage"). The EIFS exclusion is latently ambiguous: it could reasonably be interpreted

15  according to its plain and ordinary language or according to trade usage. <u>Restatement</u>

16  <u>(Second) of Contracts</u> § 222(3) ("Unless otherwise agreed, . . . a usage of trade of which [the

17  parties] know or have reason to know gives meaning to or supplements or qualifies their

18  agreement."); <u>cf. id.</u> cmt. c, illus. 9. An ambiguous exclusion is construed "by examining the

19  purpose of the exclusion in question, the public policy considerations involved and the

20  transaction as a whole," <u>Ohio Cas. Ins. Co. v. Henderson</u>, 189 Ariz. 184, 186, 939 P.2d 1337,

21  1339 (1997) (quoting <u>Transamerica Ins. Grp. v. Meere</u>, 143 Ariz. 351, 355, 694 P.2d 181,

22  185 (1984)), but "the core question is whether the policy language is, in fact, ambiguous

23  under the facts of this case." <u>Emp'rs Mut. Cas. Co.</u>, 218 Ariz. at 264, 183 P.3d at 515.

24       It is unlikely that the exclusion was ever meant to be applied to the type of stucco

25  work performed by ANSE at the Development. An insurance industry publication defines

26  EIFS as "a construction technique for the application of a synthetic waterproof exterior,

27  similar to stucco," and explains that exclusion CG 21 86 12 04 was developed in response

28  to several sizeable lawsuits arising from faulty application of EIFS. 2 International Risk

1    Management Institute, <u>Commercial Liability Insurance</u> at VI.I.85;[7] <u>see</u> J. Stephen Berry,

2    Jerry B. McNally, <u>Recent Developments in Insurance Coverage of Construction Defects</u>, 41

3    Tort Trial & Ins. Prac. L.J. 1079, 1097 (2006) ("Some recent policies contain an 'EIFS

4    exclusion,' excluding coverage of 'property damage' caused by synthetic stucco included in

5    the 'products-completed operations hazard' and arising out of 'your work.' "). According to

6    Plaintiffs, the exclusion is inapplicable because stucco "does not create the risks of loss the

7    EIFS exclusion was designed to eliminate." (Doc. 288 at 10.)

8        LMFIC agrees that "[t]he purpose of the exclusion is to create an exception for finish

9    systems with certain characteristics that have presumably been associated with a significantly

10   higher risk of liability" (Doc. 292 at 7), but is silent as to whether traditional stucco carries

11   the same risks of liability as EIFS. LMFIC offers no evidence one way or the other, instead

12   arguing "[f]irst and foremost" that Plaintiffs "introduced no admissible evidence to support

13   their competing interpretation." (Doc. 296 at 8.) It is undisputed, however, that EIFS and the

14   type of stucco work performed at the development are not the same thing. For example, the

15   material composition is different: the base coat of EIFS is a synthetic acrylic polymer but the

16   base coat of stucco is a Portland cement mixture; EIFS is reinforced by fiberglass mesh but

17   stucco is reinforced by a metal mesh. (Docs. 266 at 3; 288-1 at 62.; 296 at 11) The functional

18   properties of the completed systems are also different: EIFS is waterproof while stucco is

19   water resistant. (Docs. 288-1 at 65; 296 at 11.) Since the EIFS exclusion arose as a

20   consequence of damage caused by water getting trapped behind an otherwise waterproof

21   exterior, and given the different functional properties of EIFS and stucco, it seems unlikely

22   that EIFS and natural stucco present the same risks of liability.[8]

23       Applicable public policy considerations also suggest the exclusion should be

24

---

25       [7] Although LMFIC argues the Court cannot consider this evidence, its contents could

26   be admitted at trial; therefore, the Court may consider it. <u>See</u> <u>Fraser</u>, 342 F.3d at 1036-37.

27       [8] In light of the overwhelming authority distinguishing the two finishing systems,

     insurance industry guidance regarding the applicability of exclusion CG 21 86 12 04 to

28   natural stucco would be helpful in avoiding relitigation of this issue.

construed in favor of coverage. The Supreme Court of Arizona "has long stood for the proposition that, in buying insurance, consumers are entitled to get what they pay for." Wilson, 162 Ariz. at 256, 782 P.2d at 732. Here, stucco is not mentioned in the exclusion and "[e]xclusions in an insurance contract are strictly construed in favor of coverage and against the insurer." Warfe v. Rocky Mountain Fire & Cas. Co., 121 Ariz. 262, 264, 589 P.2d 905, 907 (App. 1978). Since the purpose of the transaction as a whole was to insure ANSE's stucco operations and satisfy ANSE's contractual obligation, see discussion infra Part II, the Court concludes that LMFIC and ANSE intended the term "exterior insulation and finishing systems" to mean a specific type of synthetic water-proof cladding system, rather than the natural water-permeable stucco applied by ANSE at the Development.

LMFIC argues that finding the exclusion ambiguous is a judicial reformation of the Policies merely to avoid harsh results. However, it is clear that EIFS is routinely distinguished from traditional stucco and there is no authority treating the two systems as interchangeable. Therefore, it was reasonable for ANSE to understand the term "exterior insulation and finish system" to carry a specific meaning unique to the construction industry. Because the material composition and functional properties of EIFS and stucco differ such that their fundamental characteristics are not "qualitatively common," the enumerated definition of EIFS does not signal any intent to exclude traditional stucco from coverage to an unsuspecting insured like ANSE.

Explained in more detail below, any serious doubt as to whether the parties intended the exclusion to encompass traditional stucco is extinguished by the circumstances of the case: LMFIC accepted ANSE's premium payments knowing full well that ANSE's activities were limited to the application of stucco, as opposed to EIFS. It is unreasonable to infer that the parties mutually intended the EIFS exclusion to bar ANSE from making any claim under the policies. Thus, regardless of whether: the exclusion was ambiguous and construed in favor of coverage; the facts of the case clarify any latent ambiguity; or the Court is merely fulfilling its obligation "to enforce the agreement according to the parties' intent, even if the language ordinarily might mean something different," Taylor, 175 Ariz. at 153, 854 P.2d at

1139, the Policies cover ANSE's stucco activities.

**II.   Even if Unambiguous, the Exclusion Would Defeat ANSE's Objectively Reasonable Expectation of Coverage**

LMFIC argues the reasonable expectations doctrine does not apply because Plaintiffs failed to "show[] that LMFIC induced ANSE with misleading representations." (Doc. 296 at 7). However, that argument was expressly rejected in Averett. The defendant insurer in Averett argued that the reasonable expectations doctrine did not apply because there was no evidence "that its agent made misleading statements or promises to induce [the insured] to purchase this policy." 177 Ariz. at 533, 869 P.2d at 507. The Supreme Court of Arizona disagreed noting that "[t]he absence of misrepresentation is not determinative." Id.; see also Bogart, 149 Ariz. at 151, 717 P.2d at 455 (1986) (explaining the doctrine is not limited to "misrepresentation actions").

Even if the law was what LMFIC claims it is, the doctrine would still apply. LMFIC conducted a premium audit which disclosed ANSE's insured operations as being limited to the installation of stucco. Plaintiffs and AHAC/CIIC allege that LMFIC knew that the EIFS exclusion would bar any and all coverage for claims arising from those operations, but that LMFIC promised ANSE insurance coverage for those operations in exchange for premium payments. If LMFIC intended ANSE to rely on its promise, ANSE would have a colorable statutory fraud claim against LMFIC, see A.R.S. § 44-1522(A); if ANSE also had a right to rely, then ANSE would also have a colorable common law fraud claim. Lerner v. DMB Realty, LLC, No. 1 CA-CV 11-0339, 2014 WL 560922, at *3 (Ariz. Ct. App. Feb. 13, 2014).

The starting point for the reasonable-expectations analysis is "to determine what expectations have been induced." Darner, 140 Ariz. at 390, 682 P.2d at 395. "An analysis of . . . the circumstances surrounding [the Policies'] acquisition and issuance" makes it clear that the dickered deal was for insurance coverage of ANSE's application of stucco at the Development. State Farm Mut. Auto. Ins. Co. v. Falness, 178 Ariz. 281, 282, 872 P.2d 1233, 1234 (1994). It is undisputed that: Del Webb subcontracted all stucco work to ANSE; the subcontracts required ANSE to maintain CGL insurance that named Del Webb as an

additional insured; LMFIC issued two such policies to ANSE; and during the period covered by the Policies, 99% of ANSE's business was stucco work. (Docs. 265-1 at 5; 265-2 at 4; 265-3 at 17-18, 25, 42, 72-73, 99-100, 105, 109, 124, 145, 164; 266 ¶ 12; 288-1 at 67.) The Court finds ANSE's expectation of coverage for damages arising from stucco was induced by LMFIC's promise to provide insurance. That expectation was not only reasonable, it was the raison d'être for the contracts. There is no evidence from which a reasonable factfinder could conclude that ANSE's expectation was unreasonable. Consequently, AHAC/CIIC has carried its burden in showing the absence of genuine dispute as to whether ANSE's expectation of coverage was objectively reasonable.

LMFIC argues that the facts do not prove LMFIC had reason to believe ANSE would not have purchased the Policies if it had known of the EIFS exclusion. LMFIC denies that it knew ANSE was engaged exclusively in stucco, arguing instead that it merely knew "ANSE was generally engaged in the masonry / plastering / stucco business." (Doc. 296 at 7.) However, LMFIC's own audit described no work other than that related to the application of stucco,[9] and the final premium LMFIC charged ANSE was adjusted off of that audit. After conducting an audit that describes the sole operations of ANSE as the installation of stucco, and adjusting the premium LMFIC charged ANSE based on that audit, it is unreasonable to infer that LMFIC did not actually know that the only business operations of ANSE during the time period covered by the Policies was stucco installation. Consideration of the format and clarity of the Policies further suggests that the exclusion is "a boilerplate term that undercut[s] the dickered deal." Gordinier, 154 Ariz. at 272, 742 P.2d at 283. The Policies are 85 pages of boilerplate; the EIFS exclusions appear on page 60 and do not mention stucco; and ANSE paid LMFIC more than $230,000.00 in premiums after LMFIC conducted a premium audit. (Docs. 265-1 at 63; 265-2 at 63; 288-1 at 24, 34, 39.)

_____

[9] LMFIC's auditor described ANSE's work as the "application of exterior stucco. The insured's employees perform both the lathing and the actual stucco work. Lathing involves the nailing of thin wood or metal strips to studs or joists, which are used to support the application of plaster or stucco on the outside of buildings." (Doc. 288-1 at 34.)

1    LMFIC does not claim that it did not know the EIFS exclusion would bar any claims

2    for damages arising from installation of stucco; rather, LMFIC's argument all along has been

3    that the exclusion necessarily bars coverage for all of the work that ANSE performed at the

4    Development. Since LMFIC knew ANSE's operations were limited to installing stucco, there

5    is no genuine dispute as to whether LMFIC had reason to believe that ANSE would not have

6    purchased the Policies if it had known of the presence of the EIFS exclusion. See Darner, 140

7    Ariz. at 392, 682 P.2d at 397 (quoting Restatement (Second) of Contracts § 211 cmt. f)

8    ("Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from

9    the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that

10   it eliminates the dominant purpose of the transaction."). There is no evidence in the record

11   from which a reasonable trier of fact could conclude otherwise. As the two predicate

12   conditions are present, the Court turns to whether one or more of the Gordinier situations

13   apply. There are four such classes of "Gordinier" situations:

14   1. Where the contract terms, although not ambiguous to the court, cannot be
15   understood by the reasonably intelligent consumer who might check on his or her
     rights, the court will interpret them in light of the objective, reasonable expectations
16   of the average insured;

17   2. Where the insured did not receive full and adequate notice of the term in question,
     and the provision is either unusual or unexpected, or one that emasculates apparent
18   coverage;

19   3. Where some activity which can be reasonably attributed to the insurer would create
     an objective impression of coverage in the mind of a reasonable insured;

20   4. Where some activity reasonably attributable to the insurer has induced a particular
     insured reasonably to believe that he has coverage, although such coverage is
21   expressly and unambiguously denied by the policy.

22   Action Acquisitions, LLC, 218 Ariz. 394, 401, 187 P.3d 1107, 1114 (2008) (quoting

23   Gordinier, 154 Ariz. at 272-73, 742 P.2d at 283-84).

24   The foregoing makes it clear that the circumstances of this case fall within the

25   " 'limited variety of situations' in which Arizona courts will not enforce boilerplate terms in

26   standardized insurance contracts." Phila. Indem. Ins. Co. v. Barerra, 200 Ariz. 9, 18, 21 P.3d

27   395, 404 (2001) (quoting Averett, 177 Ariz. at 533, 869 P.2d at 507). In particular, the first

28   Gordinier situation is present. "When an exclusion . . . significantly diminishes coverage that

1    the policy purports on its face to provide, the surrounding facts and circumstances must be

2    considered to determine whether, and to what extent, there was a meeting of the minds

3    between the contracting parties." <u>Barerra</u>, 200 Ariz. at 17, 21 P.3d at 403 (quoting <u>Averett</u>,

4    177 Ariz. at 534, 869 P.2d at 508); <u>see</u> <u>Warfe</u>, 121 Ariz. at 264, 589 P.2d at 907. If the

5    insurer seeks to carve out exceptions to its liability under a policy, it must bring the terms of

6    the exclusion home to the insured. <u>See</u> <u>Transamerica Ins. Co. v. McKee</u>, 27 Ariz.App. 158,

7    162, 551 P.2d 1324, 1328 (1976).

8         Here, there was no meeting of the minds: ANSE intended to purchase insurance to

9    cover its stucco operations and comply with its contractual obligation to maintain insurance;

10   LMFIC intended to exclude from coverage any damages arising from application of natural

11   stucco. "In addition, a term that, without clear warning, eliminates a dominant purpose of the

12   transaction defies reasonable expectations." <u>Barerra</u>, 200 Ariz. at 17, 21 P.3d at 403 (citing

13   <u>Darner</u>, 140 Ariz. at 392, 682 P.2d at 397). There was no clear warning: the exclusion was

14   buried 60 pages deep into 85 pages of boilerplate and does not mention stucco. Notably, the

15   only mention of stucco in the Policies and underwriting files is as a description of ANSE's

16   business or business activities.

17        As detailed above, the negotiated bargain was for ANSE to pay premiums in exchange

18   for LMFIC's promise to insure ANSE's business operations; operations that LMFIC knew

19   to be the application of traditional stucco. Operating under the assumption that the EIFS

20   exclusion unambiguously encompasses traditional stucco, the notion that ANSE saw and

21   understood the exclusion to mean that ANSE could not make a claim for 99% of its

22   operations, but nevertheless purchased the Policies, is belied by the ineluctable inference that

23   ANSE would not pay close to a quarter-million dollars for something it knew to be worthless.

24   It is thus unreasonable to conclude the exclusion reflects the mutual intent of the parties. It

25   is far more likely that ANSE did not understand the exclusion to mean what LMFIC now

26   says it means. <u>See</u> discussion <u>supra</u> Part I.

27        The Court concludes the first <u>Gordinier</u> category renders the "so-called exclusion

28   unenforceable . . . 'because of its technical wording and inconspicuous location within the

1    policy boilerplate, and because it guts the coverage ostensibly granted.' " <u>Barerra</u>, 200 Ariz.

2    at 17, 21 P.3d at 403 (quoting <u>State Farm Mut. Auto. Ins. Co. v. Dimmer</u>, 160 Ariz. 453, 462,

3    773 P.2d 1012, 1021 (App.1988)). In sum, there is no genuine dispute regarding: the

4    objective reasonableness of ANSE's expectation of coverage for its stucco operations;

5    LMFIC's reason to believe ANSE would not have purchased the Policies if ANSE had

6    known of the EIFS exclusion; and ANSE's inability to have understood the exclusion to have

7    completely precluded any claim against the Policies for its stucco operations. Therefore, the

8    Court will interpret the EIFS exclusion in light of ANSE's objectively reasonable expectation

9    of coverage—ANSE's stucco operations are covered by the Policies.

10         The third and fourth and <u>Gordinier</u> categories apply as well. LMFIC sent an auditor

11   to meet with ANSE's president at its corporate headquarters in order to perform a premium

12   audit in which the auditor confirmed ANSE's operations matched with its payrolls. The

13   auditor's description of ANSE's work was limited to operations related to the application of

14   stucco; there was no mention of plaster or masonry. After the audit was completed, LMFIC

15   charged a premium of $125,754.00 for the first year and $73,924.00 for the second year.

16   LMFIC's charging a premium after confirming ANSE's operational activities were limited

17   to stucco "would undoubtedly 'create an objective impression of coverage in the mind of a

18   reasonable insured.' " <u>Id.</u> (quoting <u>Gordinier</u>, 154 Ariz. at 273, 742 P.2d at 284.) In any

19   event, even assuming <u>arguendo</u> that the terms of the exclusion were unambiguous, carried

20   no special meaning, and clearly and distinctly communicated the nature of the limitation, the

21   court will not interpret the exclusion so as to defeat ANSE's objectively reasonable

22   expectation of coverage.

23         Although LMFIC opines that the Court's refusal to enforce the exclusion under

24   Arizona's reasonable-expectations doctrine renders all EIFS exclusions invalid as long as the

25   insured is in the masonry business, that argument rests on the premise that the Court refused

26   to enforce the exclusion only because ANSE is a masonry business. As discussed above,

27   LMFIC's premise is flawed and its generalization is faulty. Insurers can avoid the result

28   reached here by simply not making illusory promises. Moreover, the issue is not whether

EIFS exclusions are categorically contrary to the reasonable expectations of coverage for all masonry businesses. The issue is whether one particular masonry business' expectation of coverage was reasonable given a very specific, undisputed, and well developed factual record. Falness, 178 Ariz. at 282, 872 P.2d at 1234 (explaining whether the reasonable-expectations doctrine renders an exclusion unenforceable depends on the circumstances); e.g. Averett, 177 Ariz. at 533, 869 P.2d at 507 (noting exclusion may be enforceable in some circumstances but not in others).

The facts in this case unequivocally establish that ANSE's expectation of coverage for its stucco work was the dickered deal. LMFIC contracted to insure ANSE's operations—operations that LMFIC knew to be the application of stucco, not EIFS. In exchange for LMFIC's promise, ANSE payed sizeable sums to LMFIC—payments which LMFIC accepted. Now that a claim has been made on LMFIC's promise to insure, LMFIC argues that a standardized exclusion for EIFS, concealed under a heavy cloak of boilerplate, excludes from coverage not just EIFS, but also the very activity that LMFIC knew it had contracted to insure. LMFIC's argument means that LMFIC let ANSE believe its stucco activities were covered even though LMFIC knew otherwise.

The proposition that LMFIC accepted ANSE's payments for coverage but never intended or promised to insure ANSE's stucco operations at the Development is not only untenable, it is unconscionable. See Anderson v. Country Life Ins. Co., 180 Ariz. 625, 632-35, 886 P.2d 1381, 1388-91 (App. 1994) (alteration omitted) (quoting Glarner v. Time Insurance Co., 465 N.W.2d 591, 593-94 (Minn. Ct. App.1991)) (refusing to enforce provision that allowed insurer to collect premium without conferring any benefit to insured and noting "it would be unconscionable to permit an insurance company . . . receiving a premium . . . to say that it had not bound itself to give anything whatever"). As there is no evidence that LMFIC and ANSE intended for all of ANSE's work at the Development to be inside the scope of the exclusion, the exclusion is inapposite and stucco is covered by the Policies.

/ / /

### III.    LMFIC Owed a Duty to Defend from the Date of Del Webb's Tender

Since ANSE's work was covered by the Policies, LMFIC owed Del Webb a duty to defend. The only remaining issue is to determine when that duty arose. AHAC/CIIC assert the duty was triggered by the Roberts Arbitration Demand and the Zelkind Complaint because they alleged property damage arising from stucco. (Doc. 264 at 8.) LMFIC argues that not even the potential for coverage existed. (Doc. 297 at 2.)

The Court agrees with AHAC/CIIC. The Roberts Arbitration Demand and the Zelkind Complaint included allegations that property damage resulted from stucco defects. ANSE was the stucco contractor for the entire Development. It was possible that the stucco defects—and resultant damage—were the product of ANSE's negligence. Since the Policies cover ANSE's negligence, the Roberts Arbitration Demand and the Zelkind Complaint facially alleged facts which came within the coverage of the Policies. Therefore, LMFIC was "obligated to assume the defense of the action[s]." Kepner, 109 Ariz. at 331, 509 P.2d at 224.

LMFIC's duty to defend arose when Del Webb tendered its defense. Regal Homes, Inc. v. CNA Ins., 217 Ariz. 159, 164, 171 P.3d 610, 615 (App. 2007) (quoting INA Ins. Co. of N. Am. v. Valley Forge Ins. Co., 150 Ariz. 248, 255, 722 P.2d 975, 982 (App. 1986)) ("The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable."). LMFIC's argument that no duty is owed unless and until the Court determines the existence of such a duty ignores Kepner: "If the insurer refuses to defend and awaits the determination of its obligation in a subsequent proceeding, it acts at its peril, and if it guesses wrong it must bear the consequences of its breach of contract." 109 Ariz. at 332, 509 P.2d at 225. LMFIC could have offered defense under a reservation of rights, Morris, 154 Ariz. at 118-19, 741 P.2d at 251-52, but instead chose to deny coverage and await a judicial determination of its obligation to defend. LMFIC guessed wrong and must bear the consequences of its breach.

Accordingly,

**IT IS HEREBY ORDERED granting** AHAC/CIIC's Motion for Partial Summary Judgment Against LMFIC. (Doc. 264.)

1     **IT IS FURTHER ORDERED denying** LMFIC's Motion for Summary Judgment

2   Against Plaintiffs' and Cross-claimants' Claims. (Doc. 267.)

3     DATED this 28th day of March, 2014.

                                       Stephen M. McNamee
                              Senior United States District Judge